# 𝔖taunton

JOHN L. YORKE V. CHARLIE H. COTTLE.

September 13, 1939.

Record No. 2084.

Present, All the Justices.

The opinion states the case.

*Leith S. Bremner, Charles U. Williams* and *Robert Lewis Young,* for the plaintiff in error.

*Walter M. Evans* and *J. Roland Rooke,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

Charlie H. Cottle instituted an action against John L. Yorke for injuries he sustained in an automobile accident. The trial resulted in a verdict for the plaintiff for $5,000.00, which was confirmed by the court. The defendant was granted a writ of error, thus the case is before us for review.

The parties will be generally referred to by their surnames.

On July 29, 1936, a number of young persons went on a party, which was suggested and arranged by Yorke. He mentioned it in the early part of the day to Cottle, who made what is now termed a date with Miss Maynard, and in accordance with the prearrangement, Yorke with Miss Mason, and Cottle with Miss Maynard, drove from Richmond to what is known as the Wigwam, which is a road-

side place of entertainment. They were followed by a young man named Lutz, who was driving his own car, with a Miss Kilby. The six persons constituted the party. The four, first mentioned, occupied Yorke's car, which was driven by himself. It was a new Oldsmobile convertible coupe. Cottle and Miss Maynard rode in the rumble seat. The top was up but the occupants of the rumble seat could communicate with the driver and his companion through the opening at the back.

They stayed at the Wigwam about an hour and a half, talking, dancing and merrymaking. Yorke carried a quart of whiskey to the Wigwam and Lutz took a pint, which was their stock. Most of the liquor was consumed by the men of the party and another party of four or six, which occupied an adjacent booth, whose liquor had given out, was befriended by the young men mentioned. About twelve-thirty, the hour for closing the Wigwam, they had to leave and, piloted again by Yorke, who conceived the idea, the party, as originally constituted and related, set out, in accordance with Yorke's plan, to go to an eating house, which kept later hours, on the Mechanicsville turnpike. They never reached the latter place because en route Yorke, in taking a sharp curve on a rough and lonely road, with which he alone of the party was familiar, wrecked his car, injuring all of its occupants. The one most slightly hurt was himself.

Cottle, fortified, as he is, by the verdict of the jury and the judgment of the court, is entitled to have his case stated and considered in the light most favorable to him which accords with the evidence.

It was a very dark night. Yorke was the only one of the party who knew the Wigwam and the restaurant on the Mechanicsville turnpike. He knew the ways and the roads by which the places were reached to which he planned to go. He was the driver of a milk truck and used these roads and ways every day and sometimes several times a day. He was perfectly familiar with what was known as Second street road, on which the curve was, where the wreckage

happened. He selected the route from the Wigwam to the point of the accident. At the turns on the way he would stop and wait to see that Lutz was following. The distance from the Wigwam to the point of the accident was considerable; indeed, by the route which was pursued it was estimated as in excess of three miles. There were a number of curves, and dips, and hills in Second street road. By some of the witnesses it was called "a turtle back road," that is, it was high in the middle and sloped to each side. Several days before the accident some work had been done on the road at the point of the accident, such as cleaning out the ditches on either side, and the dirt was pulled over on the shoulders, which were narrow, and some of it reached the macadam portion of the road and by traffic was extended over the margin of the macadam some distance. At the last curve of importance before reaching that of the point of the accident, Yorke had developed a speed which was estimated by the three occupants of his car at from 50 to 60 miles per hour. He was traveling so fast that Miss Mason and Miss Maynard became alarmed and protested at the way in which he was driving. The former described it as the following questions and answers indicate:

"Q. Let's get back and start where he got into Second Street. After he made the turn into Second Street just go on from there and state what happened.

"A. Well, he was gradually gaining speed and he got to going what I considered was entirely too fast and he went around a curve going so fast that I was scared and when we got around the curve and I got my breath I said: 'Johnnie!' and he looked at me and laughed and said: 'That is all right, Margaret; I know this road perfectly; I drive it every morning on my route.'

"Q. Then what happened after that? Did he slow down when you said that?

"A. After that I thought naturally he would slow down, but he didn't and before I realized he wasn't going to slow down it seemed like we had come on the curve we turned over on.

"Q. Now when he came on to this curve you said you turned over on, what happened?

"A. Well, he came upon the curve and he evidently didn't see it and he tried to cut to make it and lost control of the car and we went from one side of the road to the other several times and then evidently turned over; I don't remember the actual turning over at all."

This witness and Miss Maynard testified that when they remonstrated with him he was not keeping a lookout and not fixing his attention upon the road, Miss Mason saying that he turned to her and laughed and took his eyes off the road, and Miss Maynard declaring that she called to him saying: "Johnnie, don't go so fast," but he paid no attention to her for he was talking to Miss Mason.

The evidence abundantly shows that Yorke's rate of speed was terrific considering all the conditions that obtained. He struck the curve at the place of the accident at such speed that he could not turn with it but was forced to cut straight across from the middle of the road, where his car was, and then began a zig-zag performance, from one side of the road to the other, in and out of a hedge, until the car rolled over, but not until it had skidded 245 feet from where he applied his brakes to the point of its overturning. The result to those who were in his care has been referred to. Cottle was seriously injured. He was unconscious for a considerable length of time and spent something like a month in a hospital and another in bed at the home of an aunt, with whom he had been staying.

██ Cottle was a comparative stranger in the city of Richmond. He had recently come from Clifton Forge. One of the defenses was that of contributory negligence. It was urged that it was the duty of Cottle to warn Yorke and not having done so, he cannot recover. It is patent, of course, that Miss Maynard, who was sitting by Cottle's side, in the rumble seat, did warn Yorke, but without avail. He paid no attention to her. It would seem vain for Cottle to have done the same thing. Again, he was not in a position to become aware of the danger or hazards that were

at hand. Yorke was in such position. No end of warning from Cottle, had he been conscious of danger, could have carried to Yorke greater awareness of his peril than he already had or ought to have had.

See *Morris* v. *Dame's Ex'r*, 161 Va. 545, 171 S. E. 662, 668; *Yonker* v. *Williams*, 169 Va. 294, 192 S. E. 753, 755.

The defense of contributory negligence was also based upon the contention that Yorke had consumed so much liquor in the presence of Cottle that the latter was charged with notice that he was an unsafe driver and it was negligence to ride in an automobile driven by him.

The case is wholly lacking in proof of intoxication upon the part of Yorke. In fact, there is no testimony, except his own, that he was at all under the influence of liquor. Really a quart and a pint of whiskey is not a large quantity when it is considered that it supplied so many who were thirsty. It must be said, however, in deference to the young ladies of the party, that they partook very slightly, if at all, of the whiskey.

The questions which were at issue in the case and upon which it turned, namely, gross negligence, contributory negligence, protest and warning, and intoxication and its degrees, were for the jury. The verdict and the judgment of the court thereon should not be overthrown by this court unless it is patently contrary to the law and the evidence. This is not the case here.

See *Poole* v. *Kelley*, 162 Va. 279, 290, 173 S. E. 537, 541; *Watson* v. *Coles*, 170 Va. 141, 195 S. E. 506, 508; *Drumwright* v. *Walker*, 167 Va. 307, 189 S. E. 310; *Margiotta* v. *Aycock*, 162 Va. 557, 174 S. E. 831, 834.

In the *Poole* v. *Kelley Case, supra*, this court said: "The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case were such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such

.that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury."

Being of the opinion to affirm the case, it is unnecessary to pass upon the motion to dismiss the writ of error as improvidently awarded. The defense of a joint venture, hinted at in Yorke's brief, is manifestly unsound.

A careful examination of the instructions given in the case brings us to the conclusion that the jury was properly instructed.

We affirm the judgment of the trial court.

*Affirmed.*