# Wytheville

## WILLIAM P. CARROLL v. ANNIE MILLER.

June 10, 1940.

Record No. 2220.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Hughes, Little & Seawell,* for the plaintiff in error.

*James G. Martin & Son,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Annie Miller, 22, was awarded a verdict and judgment for $4,500 against William P. Carroll, also 22, as damages for serious injuries received by her as the result of an automobile accident while riding as the guest of young Carroll on a street in Norfolk shortly after midnight of October 26, 1938.

At the close of the plaintiff's evidence the defendant moved to strike it. The motion was overruled, and, being renewed at the conclusion of all the evidence, was again overruled, as was a motion to set aside the jury's verdict because it was contrary to the evidence and without evidence to support it. Objection was also made to the giving of certain instructions for the plaintiff and to the rejection of others tendered on behalf of the defendant.

From the evidence it appears that the plaintiff and the defendant had long been friends and that she had ridden with him on numerous occasions. On the evening in question Carroll called for Miss Miller at her home about 8 o'clock and they drove out on the North Shore road to the home of a friend, Mr. Thompson, where there was a gathering of young people. They started back shortly after midnight, Miss Miller sitting beside Carroll on the front seat. The night was clear and the roadway, with which Carroll was quite familiar, was dry. The car was proceeding in a westerly direction on North Shore road through a residential section of Norfolk towards Hampton boulevard. The road had several curves in it but none of them was very sharp. At the point of accident, which was not more than half a mile from the Thompson place, the road was 20 feet wide and bounded by a curb 4 inches high. The car was a '36

Ford sedan, which Carroll had bought second-hand about two weeks previous. Apparently it was in good condition. He testified that he did not look at the speedometer but that he estimated his speed at the time of the accident at 35 miles per hour. His car turned to the right, ran over a 4-inch right hand curb, caromed from a tree standing 4.7 feet from the curb and struck another head-on 40 feet away and 3.3 feet from the curb, at which it came to rest. Miss Miller's face was badly lacerated and several teeth were knocked out; Mr. Carroll's chin was cut and his leg was scratched, and it is not claimed that her recovery is excessive.

Plaintiff and defendant were the only eyewitnesses. Their testimony is forthright and free from bias; plainly each attempted to tell just what occurred, and there is little conflict.

Her testimony is that they were driving "at just a considerable speed." "It seemed that suddenly we were going a little faster and I looked up and I saw the curve that goes more sharply than the one we had been on, and I said something to the effect, 'Look out, Billie.' At that time I heard the tires scream sort of and then it crashed." She was asked if there were any blowouts, and answered: "Not that I heard." The noise made by the tires was the "Usual noise that a tire makes when it goes around a curve." There was no traffic ahead, but they were followed by another car driven by Mr. Ludwell Baldwin, who had come from the same home at which she had visited. She said that there was a sudden turn to the left. Questioned further as to this, she said:

"Q. Now, the car made some sharp movement, did it not, and went up and struck that first tree—sideswiped it?

"A. Made a sharp movement?

"Q. I am asking you if it did?

"A. I don't remember any particular sharp movement. We did not make the turn, that is the way it seemed to me.

"Mr. Martin: Just a little louder.

"A. I say, the way it seemed to me, we were trying to get round the curve and just didn't get around it.

"By Mr. Seawell:

"Q. Did you feel the jar when the wheel hit the curb?

"A. Yes, sir.

"Q. You did? Was that when you said, 'Look out, Bill'?

"A. I think that was slightly before that.

"Q. How long before, would you say?

"A. Well, a second or two.

"Q. Just a second or two?

"A. I don't remember just how long."

Plainly she was mistaken as to the direction of the movement; it was to the right. She also tells us about the glancing blow struck the first tree and about final collision with the second. Since she heard no blowout, she could not tell where it occurred, if it occurred at all.

Mr. Carroll had lived in Norfolk all his life and had driven over this particular road many times. He had owned several cars and was a driver with six years' experience. With a map before him, he said:

"I was driving through here—and the road goes on back that way (pointing)—I came around here, and I judge right along here somewhere my right front tire gave way. I went up on the curbstone here and hit this tree, scraped this tree on the side, and hit this one directly in front of the car—the second tree."

He was asked: "Q. You say your right front tire gave away? What was the effect of that?" "A. It jerked to the right," mounted the curb, hit the first tree, glanced off and struck the next, "directly in the middle of the car in the front."

"Q. You mean to swear to this jury you had a blowout before this car swerved?

"A. As far as I know, I did, sir.

"Q. Did you hear it?

"A. I didn't hear the tire blow out, no, sir.

"Q. You did not hear it blow out?

"A. No, sir.

"Q. Isn't that just an *average* thought that you think it must have blown out to swerve you?

"A. No, sir. I could tell by the action of the car.

"Q. The action of the car was such that you thought you had a blowout without hearing any noise?

"A. Yes, sir."

He was asked if he did not know that the tire was broken when it hit the curbstone and if he had not made that admission to Mr. Miller and answered: "No, sir," but in answer to repeated questions on cross-examination said: "I don't remember making any statement of that kind." He was further questioned as to what Miss Miller said at the time of the accident and was asked: "Miss Miller says that just as the accident was about to happen—as she expressed it, 'Didn't have time to do anything'—she said, 'Bill, look out', or words to that effect. Do you remember her saying anything?" He answered: "I don't remember her saying it. I don't recall." As his car mounted the curb and hit the first tree 4.7 feet away, all of which must have occurred in a fraction of a second, he lost control.

Mr. Miller, father of the plaintiff who had been taken to a hospital, gives this account of a conversation which he had with Carroll:

"Q. Mr. Miller, something has been said by Mr. Carroll about a blowout. Did you talk to him after the accident about that?

"A. I discussed the accident with him, or asked him about it, yes.

"Q. Was he or not able to tell you whether the supposed blowout occurred before or after he hit the curb?

"A. He didn't say when; didn't go into that detail. I asked Billie what happened and he told me he had a blowout. Of course, I didn't know whether he rolled the wheel off of the rim and the tire blew out or it hit the curbing, but after looking it over I talked to him about it and I made the assertion that it probably blew out when he hit the curb. That was all it was to it.

"Q. Did he deny that or not?

"A. He didn't deny it. That was my impression rather; no, sir. I would not say he was confused about it one way or the other, because he didn't say."

The outer casing of the right front tire was introduced in evidence. It has a break near the rim on its left hand side, such as a blowout would probably make, and this physical fact is not questioned. The innertube was not produced. On cross-examination Carroll was asked if he had thrown it away and answered: "I didn't; I didn't throw it away myself; it was lost." It is true that Miller talked with Carroll, who told him that the accident was due to a blowout, and in the course of that conversation Miller then said: "I made the assertion that it probably blew out when he hit the curb * * * . That was my impression rather," and to that statement Carroll made no reply, but his statement that his car suddenly moved sharply to the right still stands. If it was then "jerked to the right," as Carroll said it was, and that statement is not questioned, unless it was by the plaintiff when she said, "I don't remember any particular sharp movement," then the movement in all human probability was due to the blowout. It was what might have been expected to happen if the right front tire collapsed and accounts for the fact that it was then that Carroll lost control. The chances that it did so happen are enhanced by the fact that a car driven off the road into the curb would, for a little distance at least, have glanced along it and would not have mounted it sharply. If the accident came about in this way, he was guilty of no negligence, simple or gross, unless negligence of some degree be predicated upon some statute.

If this be not true, it is still necessary that the plaintiff prove negligence, and since she was a guest, she must prove that this negligence was gross.

This is the rule laid down in *Boggs* v. *Plybon,* 157 Va. 30, 160 S. E. 77. The Circuit Court of Appeals was unwilling to adopt it and held that it was not bound by the decisions of our State court. *Hewlett* v. *Schadel* (1934), 68 F. (2d)

502, 91 A. L. R. 143. It did, however, commend itself to the Legislature, and for that reason, and to make the matter plain, it, by act approved March 28, 1938, Session Acts 1938, ch. 285, p. 417, said:

"No person transported by the owner or operator of any motor vehicle as a guest without payment for such transportation and no personal representative of any such guest so transported, shall be entitled to recover damages against such owner or operator for death or injuries to the person or property of such guest resulting from the operation of such motor vehicle, unless such death or injury was caused or resulted from the gross negligence or willful and wanton disregard of the safety of the person or property of the person being so transported on the part of such owner or operator."

Afterwards, and on April 25, 1938, the United States Supreme Court, in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64-92, 58 S. Ct. 817, 82 L. Ed. 1188, 114 A. L. R. 1487, held that there was no Federal common law and that it was the duty of the Federal court to follow State decisions in matters of general law.

From this it follows that as between guest and host in Virginia gross negligence is now a test in all courts, both State and Federal.

Plaintiff, in her efforts to recover, relies upon excessive speed, inattention and a State statute.

We have dealt with this question many times.

In the *Boggs Case,* a car in the nighttime, on a curve to the left, was driven too near the edge of the paved surface of the highway and slipped from it. In its attempt to come back, an accident occurred. We held that there was no gross negligence.

In *Jones* v. *Massie,* 158 Va. 121, 163 S. E. 63, a car was driven over a flat "gutter" on a Norfolk street at 25 miles an hour. Plaintiff was thrown against the roof and hurt. He was not permitted to recover.

In *Collins* v. *Robinson,* 160 Va. 520, 169 S. E. 609, a driver was held to have been grossly negligent. He drove

on the wrong side of the road on a curve so sharp as to cut off his vision and came into collision with another car which he knew was approaching.

In *Young* v. *Dyer,* 161 Va. 434, 170 S. E. 737, the verdict of the jury was set aside. There a car, running something around 50 miles an hour, was overturned when attempting to round a sharp right hand curve. The driver was unfamiliar with the road and had been cautioned by the plaintiff. We held that no gross negligence was shown. In closing his opinion, Chief Justice Campbell said:

"A mere failure to skilfully operate an automobile under all conditions, or to be alert and observant, and to act intelligently and operate an automobile at a low rate of speed may, or may not, be a failure to do what an ordinarily prudent person would have done under the circumstances, and thus amount to lack of ordinary care; but such lack of attention and diligence, or mere inadvertence, does not amount to wanton or reckless conduct, or constitute culpable negligence for which defendant would be responsible to an invited guest."

In *Poole* v. *Kelley,* 162 Va. 279, 173 S. E. 537, a driver in a car which "sounded like an airplane" passed a car ahead and travelled 165 feet, when it left the road and ran along the top of a cut 3 or 4 feet high for 400 feet, then crossed the road, turned over and came to rest facing the direction from which it had come. This was held to be gross negligence.

In *Margiotta* v. *Aycock,* 162 Va. 557, 174 S. E. 831, it was held that a verdict predicated on gross negligence should be sustained on this state of facts:

"The Lee car, with lights burning, stood in plain view on a straight road. Mr. Margiotta when 225 feet from the head of the column of parked cars recognized the fact there was some trouble down the road, yet he drove rapidly and with undiminished speed into this car which he must necessarily have seen had he looked, nor did he undertake to apply his brakes until immediately upon it. He had ample time to stop, and he had ample time in which to drive

around it. Indeed, much of the strength of the defendants' case rests in the fact that the negligence charged is unbelievably gross.

It was also said:

"Of course the jury's verdict is not always conclusive. In cases of ordinary negligence this court has always freely exercised its right to say that it is unsupported by the evidence. By the same token it has the right to say, notwithstanding the verdict, that there is no evidence whatever of gross negligence."

In *Doub* v. *Weaver*, 164 Va. 96, 178 S. E. 794, a jury's verdict was set aside. There was a collision at a crossing. At the instant of the collision defendant said that he was traveling at about 35 miles an hour. Another witness said that as it passed his service station, 75 yards away, it was going between 30 and 45 miles an hour. The trial court was of opinion that only simple negligence had been shown, and in that opinion we concurred.

In *Grinstead* v. *Mayhew*, 167 Va. 19, 187 S. E. 515, a verdict for the defendant was sustained. The car ran into the side of a bridge. The evidences as to speed were that the car was running from 60 to 65 miles an hour at a point a mile and a quarter distant from the bridge, but there was no evidence of speed at the instant of impact. This we held was not sufficient to show gross negligence.

In *Kent* v. *Miller*, 167 Va. 422, 189 S. E. 332, a verdict for the plaintiff was set aside. A door of a car came open and out of it the plaintiff fell. The car was then going around a 90-degree curve at from 45 to 50 miles an hour. The court was of opinion that this accident was not due to speed but that the car door itself had not been properly closed.

In *Stubbs* v. *Parker*, 169 Va. 676, 192 S. E. 820, 195 S. E. 688, 198 S. E. 363, it was held that under this state of facts gross negligence had been proven, three justices dissenting:

The place of accident was 433 feet north of the Boulevard Bridge on a road in Byrd Park in the city of Rich-

mond. It was midnight. The car, just after making a curve, went off the road and struck a tree, which severed the body of the car in half, and then skidded some 90 feet and came to rest upside down. There was evidence tending to show that it was traveling between 55 and 65 miles an hour and against this speed plaintiff's decedent had protested.

In *Hackley* v. *Robey*, 170 Va. 55, 195 S. E. 689, these facts appeared:

"The accident happened in the early morning of October 21, 1934, in the western outskirts of the city of Richmond, where Broad street crosses by an overhead bridge the Belt Line railroad. At that point Broad street is straight, practically level, smooth-paved, and bounded by an 8-inch curb. It is 76 feet wide until it reaches a point 74 feet from the bridge. Beginning at this point it narrows to a width of 42 feet and 6 inches where it crosses the bridge. On each side of the bridge is a concrete abutment. This situation is brightly illuminated by lights, about 100 feet apart, placed along both sides of the street."

The court said that the driver either was, or should have been, familiar with the situation; that he was driving at a high rate of speed and was maintaining no lookout for a situation which was obviously dangerous. The car failed to take the curve where the street narrows as it approaches the bridge and was demolished. Under this state of facts the driver's negligence was gross.

In *Watson* v. *Coles*, 170 Va. 141, 195 S. E. 506, two young men, when pursued by an officer, were traveling down a boulevard from 65 to 70 miles an hour. They turned into a narrow and rough road and at that speed undertook to go around a curve. This was held to be gross negligence.

In *Thornhill* v. *Thornhill*, 172 Va. 553, 2 S. E. (2d) 318, it appears that the road was wet and slippery and that the driver, who had been repeatedly cautioned as to speed, when traveling between 50 and 55 miles an hour, came to the beginning of an S curve; in an attempt to avoid an oncoming

truck, he applied his brakes too suddenly. His car skidded and an accident followed. His negligence was held to be gross.

In *Yorke* v. *Cottle,* 173 Va. 372, 4 S. E. (2d) 372, an accident occurred on a dark night on a sharp curve. The court said that the evidence abundantly showed that the speed was terrific under the circumstances and held that this was gross negligence.

In *Worcester* v. *McClurkin,* 174 Va. 221, 5 S. E. (2d) 509, we held that these facts were sufficient to support a finding of gross negligence:

"These outstanding facts point to his gross negligence: He attempted to drive some 25 miles in 30 minutes through heavy traffic and passing through the town of Phoebus, the city of Hampton and the village of Yorktown. In driving he narrowly escaped two accidents. He wove in and out of traffic and frightened Miss McClurkin. The evidence discloses that he was driving at a very high rate of speed at the time of the collision. According to his own testimony he averaged on the trip 55 to 60 miles per hour, but according to a reasonable inference from other testimony possibly as much as 80 miles per hour. He admitted that he did not see the Amory car until the impact and he confessed that it was all his fault."

In many instances we have to deal with borderline cases, and it is our duty to support verdicts when they, in turn, are supported by credible evidence, but not otherwise. Moreover, it is probably more difficult for a jury to determine whether a proven negligence be simple or gross than it is for them to decide if actionable negligence at all has been shown. Indeed, it is difficult to define gross negligence within the purview of the rule under discussion. Putting one's self in the place of the parties, to be gross it should shock fair-minded men.

In cases considered, guests sought to hold their hosts liable and in all of them speed was an element strongly relied upon to show gross negligence; but none of them got to the extent of holding, either directly or by fair inference,

that it is gross negligence for an experienced and sober driver to drive at the rate of 35 miles an hour over a surfaced road with which he was intimately familiar and which was then clear of traffic. And this notwithstanding the fact that it was in the nighttime and that the road itself curved from time to time, though not sharply. Indeed this speed in itself in these circumstances would not be negligent at all unless some statute so declared it. *Boggs* v. *Plybon, supra; Sutton* v. *Bland,* 166 Va. 132, 184 S. E. 231.

█ Proper speed, as we have so often said, is to a large measure governed by conditions. We, by statute, have undertaken to fix a limit at 55 miles. A speed in excess of that may, under certain conditions, be indulged in with safety; on the other hand, traffic and road conditions may not only make that speed unsafe but any speed unsafe. Conditions are conceivable in which any attempt to go ahead would be negligence; from which it follows that speed alone can not sustain a recovery in this case.

█ It is contended that the driver was inattentive. Casual inattention is not gross negligence, and the only evidence of it here is that the car did leave the road. This in itself is not even *per se* negligence. The defendant, whose testimony is not questioned, has told us how this occurred.

The essential facts in this case are quite like those in *Boggs* v. *Plybon, supra,* which was heard on a demurrer to evidence. In each case the driver was sober and was familiar with the road, which was clear of traffic; each driver ran off the road on a curve to the left, acute in neither case. Carroll's road was 20 feet wide; the paved surface of Plybon's road was 18 or 19 feet wide. Carroll was traveling at 35 miles an hour; Plybon at 30. Carroll's road was dry; Plybon's was wet and therefore slippery. Carroll ran off the road and struck a tree, glanced from it and struck another head-on 40 feet away; Plybon tore up four fence posts, broke a telephone post in two places and ran into a nearby apple tree. It cost $260 to repair the Carroll car; it would have cost at least $350 to repair the Plybon car, but because its damages were so extensive

it was not repaired but traded in. There is no evidence that either car was defective.

Conceding, for the sake of argument, that there was no blowout, all that we have left is speed. Plainly a speed of 35 miles an hour over a good road in which there were no sharp curves and with which the driver was familiar is not grossly excessive, and the only evidence which we have of inattention is that the car ran off the road and over a 4-inch curb.

Code, section 2154(109), says in substance that a speed in excess of 25 miles an hour in a residential district is to be deemed *prima facie* reckless driving, but plainly in itself it is not gross negligence.

It is not necessary that we consider instructions. The plaintiff has obtained a verdict and judgment; she could have no more. The defendant is not guilty of gross negligence and therefore has only an academic interest in them or in any errors which may have been committed when they were given.

For reasons stated, we are of opinion that the judgment appealed from should be reversed, and it is so ordered.

*Reversed.*