# Richmond

GARLAND B. KEEN, ADMINISTRATOR OF THE ESTATE OF OTTIS
STINSON, DECEASED v. A. J. HARMAN, ADMINISTRATOR
OF THE ESTATE OF CINDA MAY HARMAN,
DECEASED.

March 5, 1945.

Record No. 2879.

Present, All the Justices.

The opinion states the case.

*F. H. Combs* and *C. E. Hunter,* for the plaintiff in error.

S. H. and *Geo. C. Sutherland*, for the defendant in error.

Hudgins, J., delivered the opinion of the court.

On December 2, 1943, Ottis Stinson, a young man 17 years of age, invited Shirley Mutter, his 16-year-old sweetheart, Cinda May Harman, 18 years of age, and her friend, Howard McGlothlin, a soldier home on a furlough, to ride with him in his one and a half ton International truck to a basketball game in Garden City, some five miles from the home of the respective parties. On their return from the basketball game, Ottis Stinson permitted Guy Mutter and Charles Stinson, two boys about 12 years of age, to ride in the body of the truck; the other four were riding in the cab. The parties stopped at Dye's restaurant, Keen Mountain, and purchased soft drinks and other delicacies. They remained in the restaurant 15 to 20 minutes and left about 10:30 p. m. for their respective homes, one to two miles away. Soon thereafter the truck turned over. The four occupants of the cab were killed and the two small boys were seriously injured.

The administrator of the estate of Cinda May Harman instituted this action for wrongful death against the administrator of Ottis Stinson and recovered a verdict and judgment for $4,000. To that judgment this writ of error was awarded.

Two of the three assignments of error challenge the sufficiency of the evidence to convict Ottis Stinson of gross negligence. There is no substantial conflict in the testimony, hence the question presented by these two assignments of error is whether reasonably fair-minded men may differ as to the conclusion of fact to be drawn from the evidence.

The truck was traveling in a southeasterly direction on route No. 4 toward the town of Raven around a 32-degree left curve down a six per cent. grade. At the bottom of the curve, the highway is practically level and straight for some distance. The hard surface is 18 feet wide with

shoulders from 6 to 11 feet on either side. On the left is a steep bank of shale and rock extending upward at an angle of approximately 45 degrees. To the right beyond the shoulder is the right bank of the Levisa river. The tracks of the right wheels of the truck indicated that it ran off the hard surface on the right dirt shoulder and continued thereon for 100 feet to the bottom of the curve and then for 90 feet diagonally across the hard surface to and across the 6-foot left shoulder, over a 15-inch ditch and up the shale bank 10 to 15 feet, and came to rest on its top with the wheels in the air 45 feet from the last mark on the bank of shale. The front of the truck was lying on the left shoulder with the rear end extending diagonally across the hard surface.

The body of the truck was about 16 feet long. Its sides were made of boards 30 inches tall, and the floor consisted of inch boards fastened to the cross beams with 8 penny nails. The side and floor boards were knocked loose by the impact and scattered on the left shoulder and the hard surface 15 to 20 feet northwest of the spot at which the truck came to rest. The two boys were found unconscious on the left edge of the hard surface with several of the floor boards lying across them. On regaining consciousness, they stated that the last thing they remembered was leaving the restaurant. The four occupants of the cab were instantly killed, or, at least, were found dead by two motorists who came upon the scene soon after the accident.

Plaintiff contends that the condition of the weather and the physical marks on the highway, the shoulders and the shale bank, considered together, are sufficient to convict Ottis Stinson of operating his truck at such an excessive speed as to show "an utter disregard of prudence amounting to complete neglect of the safety" of his guest.

One of plaintiff's witnesses, who arrived on the scene shortly after the accident, stated: "It was drizzling rain. * * * there was some fog." The dirt and gravel on the right shoulder on the curve were plowed up and scattered by the right wheels of the truck. The tracks of the right wheels

continued for 100 feet on the right shoulder and indicated that, just before the truck returned to the hard surface, it had narrowly missed going over the end of a concrete culvert which was approximately 4 feet from the right edge of the hard surface. The marks on the shale bank to the left, about 150 feet from the end of the culvert, indicated that the truck was tilted to the right and traveling with practically all of its weight on its right wheels. There was an 8 to 10-inch mark 12 feet from the bottom of the shale bank which fitted the front end of the spring and indicated that the truck was in the act of turning over as the spring scraped the shale. There were no other scratches or marks from the end of this particular mark on the shale bank to the point 45 feet away where the truck came to rest lying on the crushed top of the cab.

Several witnesses stated that the tracks of the wheels of the truck on the soft, wet, gravel right shoulder indicated that the truck was traveling fast. F. A. Porterfield, a member of the State police force and a witness for plaintiff, stated that the tracks of the right wheels on the wet right shoulder and the manner in which the dirt and gravel were scattered indicated to him that the truck was traveling fast, "more than 35 miles per hour," but, on cross-examination, he stated that the truck could have made the same tracks and scattered gravel in like manner if it had been traveling 20 to 25 miles an hour. Use of the word "fast" in reference to the rate of speed on the highway is a relative and indefinite term. The rate of speed may be fast to one person and slow or moderate to another. As used by the witnesses in this case, the word is too indefinite to convict the operator of the truck of even simple negligence. It is a matter of common knowledge that, when the operator of a motor vehicle attempts to get his wheels back on the hard surface from a soft dirt gravel shoulder, the wheels will make tracks wider than the tread of the tires and will throw dirt and gravel in the opposite direction from that in which the wheels are being turned. No reasonable estimate of the rate

of speed of the truck can be made from the tracks described in this record.

The burden was on the plaintiff to establish by a preponderance of the evidence that the host operated his truck in such manner as to show "an utter disregard of prudence amounting to complete neglect of the safety" of his guest. Undoubtedly, the driver lost control of the truck, but just when, where and what caused him to lose control is not proven. The fact that the truck ran off the hard surface on the right shoulder was probably a contributing cause. The reason this occurred is not disclosed. It may have been due to mere inadvertence; the driver may have been crowded off the highway by another vehicle; he may have been blinded by the lights of an approaching car; he may have become suddenly ill; or the mechanism of the truck may not have functioned properly. The highway was wet, but there is no evidence of any skidding.

The fact that the truck, after it was driven back on the hard surface, continued diagonally to the left shoulder for a distance of 90 feet indicates that it was not then under control. The marks in the shale bank and the manner in which the truck came to rest are conclusive evidence that the truck was out of control. It is a matter of common knowledge that if a truck, weighing 5400 pounds, equipped with a high-powered engine and going down a 6 per cent. grade, gets out of control of the driver, its speed will be increased, it may act in a manner which seemingly defies all laws of physics and it may or may not be completely demolished when it strikes an immovable object.

The weather and the topography of the highway described in *Boggs* v. *Plybon*, 157 Va. 30, 160 S. E. 77, were strikingly like the weather and the topography of the highway detailed by the witnesses in the case at bar. The facts, as stated by Mr. Justice Holt in that opinion, were: "It had been raining on the day of the accident and there was some mist and fog at the time it occurred. The roadway itself was of macadam construction with a hard surface eighteen or nineteen feet wide. On its right-hand side going to Roanoke was a dirt

shoulder something like four feet wide whose extreme west edge sloped down at an angle of repose to the earth's surface as it originally was, about eight feet below the fill on which the road was built. At the point of the accident this road ran on a curve to the left whose radius was 900 feet and was slightly down grade. The car in question was properly on its right-hand side, but, as it afterwards developed, was too near the edge of the macadam over which it ran. When its right wheel struck the soft wet earth of the shoulder the defendant attempted to cut back on the road, but due, in all human probability, to surface conditions, he was unable to do this, lost control and suffered the accident which is the subject of inquiry here."

In the *Boggs Case,* after the driver lost control, the passenger car knocked down 4 fence posts, broke a telephone post in two places and ran into a nearby apple tree on the right side. The driver failed to get the car back on the hard surface. The driver in the case at bar succeeded in getting his truck back on the hard surface, but, in so doing, lost control of it. The motor vehicle in the *Boggs Case* was wrecked on the right side of the highway and the motor vehicle in the case at bar was wrecked on the left side of the highway. However, whether a motor vehicle, after loss of control, comes to rest on the right or the left side of the highway is immaterial, for, as stated, no one can predict with any degree of accuracy the movements of a motor vehicle out of control.

Plaintiff cites and relies upon numerous Virginia cases involving the question of the liability of the host to a guest injured in an automobile accident. All of these cases were reviewed by this court in *Carroll* v. *Miller*, 175 Va. 388, 9 S. E. (2d) 322, and *Chappell* v. *White*, 182 Va. 625, 29 S. E. (2d) 858. In the *Chappell Case* there was evidence tending to show deliberate inattention on the part of the operator of the automobile, during which period the car traveled from the right to the left side of the road. Other evidence tended to show that, after danger had been discovered, the defendant failed to take advantage of an oppor-

tunity to turn the car to the right or to apply her brakes before the car ran off the highway. We held that this evidence was sufficient to take the question of gross negligence to the jury. This record presents no such evidence.

In *Richter* v. *Seawell, ante,* p. 379, 32 S. E. (2d) 62, we held that gross negligence may be proven by circumstantial evidence, provided the circumstances relied upon showed something more than simple or ordinary negligence. If the injuries complained of may have resulted from one of two causes, for one of which defendant is responsible and for the other of which he is not, there is no liability. The facts in this case were that an automobile, traveling on a straight 4-lane highway, ran off the hard surface on the right shoulder for 354 feet. Then it swerved to the left and skidded sideways 222 feet diagonally across the hard surface and left shoulder, plunged down a cut and struck a tree 27 feet from the highway with such force that the car was completely demolished. The engine and radiator were torn from their fastenings and hurled 20 feet from the body of the car. We stated that the physical facts justified the inference that the car was proceeding at considerable speed, but there was nothing to indicate that the speed itself was so great as to constitute gross negligence or that it was the proximate cause of the accident. In the case under consideration, the hard surface of the highway was wet but there was no evidence tending to show that the truck skidded.

Mr. Justice Holt, in *Carroll* v. *Miller,* 175 Va. 388, 399, 9 S. E. (2d) 322, stated: "In many instances we have to deal with borderline cases, and it is our duty to support verdicts when they, in turn, are supported by credible evidence, but not otherwise. Moreover, it is probably more difficult for a jury to determine whether a proven negligence be simple or gross than it is for them to decide if actionable negligence at all has been shown. Indeed, it is difficult to define gross negligence within the purview of the rule under discussion. Putting one's self in the place of the parties, to be gross it should shock fair-minded men."

The result of the accident under consideration is

shocking—the untimely death of two girls of high school age and their escorts. However, the evidence introduced is not sufficient to convict the driver of gross negligence. The evidence is that, for some unexplained reason, the right wheels of the truck ran off the hard surface on the soft, wet, gravel of the right shoulder, and that then or soon thereafter the driver succeeded in getting all four wheels back on the hard surface of the highway, but, in so doing, he lost control of the truck. The plaintiff's witnesses state that the truck may have been traveling at 20 miles an hour. This is certainly not such a speed as to show "an utter disregard of prudence amounting to complete neglect of the safety" of his guest. The verdict of the jury was based on a mere guess or conjecture without sufficient credible evidence to support its finding.

There is a scintilla of evidence tending to show that sometime before the accident Stinson had taken a drink of whiskey, but the testimony is wholly insufficient to show that he was intoxicated or that his drinking was a contributing factor in the wreck of the truck.

The judgment of the trial court is reversed, the verdict of the jury set aside and final judgment entered here for defendant.

*Reversed and final judgment.*