# Richmond

## Donald J. Ketchmark v. L. David Lindauer, Adm'r of the Estate of John Henry Rau, Deceased.

April 23, 1956.

Record No. 4505.

Present, All the Justices.

The opinion states the case.

*Lawson Worrell* (*Tom E. Gilman* and *Williams, Cocke, Worrell & Kelly* on brief) for the plaintiff in error.

*James A. Howard* (*Breeden, Howard & MacMillan* on brief), for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

L. David Lindauer, as Administrator of the estate of John Henry Rau, instituted this action against David J. Ketchmark charging him with gross negligence resulting in the death of his decedent while a guest in an automobile owned and operated by Ketchmark. The administrator obtained in the lower court a verdict and judgment for $15,000.00, from which Ketchmark appeals.

The parties will be designated as plaintiff and defendant, according to the position they occupied in the lower court.

[■ Defendant's first contention is that the evidence is insufficient to support the jury's verdict finding him guilty of gross negligence.

Plaintiff, the successful litigant in the lower court, is entitled to have the evidence, and all fair inferences therefrom, stated in the light most favorable to him. So stated it may be summarized as follows:

Defendant's home is in Omaha, Nebraska, and decedent's home was in Greenfield, Mass. Both were in the United States Navy stationed aboard the U. S. S. Adirondack, then in the Navy Yard at Portsmouth, Virginia. Defendant while in Portsmouth owned and used a 1952 Plymouth automobile. It had been driven only 15,000 miles and was stated to be in "A-1 condition".

On August 18, 1953, defendant drove his car to Norfolk, and on returning to Portsmouth that afternoon he met Rau at a bar, where each drank several bottles of beer. Thereafter they, in defendant's car, went to Ocean View to see a ball game. About 7:30 P. M. they left Ocean View and *en route* to Virginia Beach stopped at a cafe, where each drank a glass of beer. Neither being familiar with the

highways in that area, defendant asked whether the highway they were on led to Virginia Beach. On being assured that it did they, defendant driving, with Rau as a passenger, left the cafe and proceeded east on Route 60. A few miles east of the cafe Route 60 makes a sharp turn to the south. Continuing straight ahead from this turn in prolongation of Route 60's east-west axis is Route 305, which leads into Fort Story, a military reservation. Defendant, instead of making the turn on Route 60 to Virginia Beach, continued straight on Route 305 into Fort Story and ran into a concrete abutment, with resulting fatal injuries to the decedent, serious injuries to himself, and the total wreck of his car.

As defendant was driving east on Route 60, a primary highway, there were posted to his right six signs indicating the maximum speed allowed, the maximum safe speed and other warning signs clearly within the range of the proper headlights of an automobile traveling east. The first of these warning signs was more than a mile west of the intersection of Routes 60 and 305, and read: "Reduced Speed Ahead"; seven-tenths of a mile from this point was a sign 4 x 6 feet reading "Slow—Sharp Curve Ahead"; approximately 165 feet from this sign was another 12 feet high reading "Maximum Safe Speed 20 Miles"; approximately 150 feet farther was another sign approximately 4 x 6 feet reading "Military Reservation 500 Feet"; approximately 200 feet farther was another sign 12 feet high reading "Maximum Safe Speed 20 Miles". In the center of the intersection was an overhanging blinker light, a sign and an arrow indicating that Route 60 turns right towards Virginia Beach. The entrance to Fort Story is 300 feet east of this intersection and is 49 feet 2 inches wide with brick pillars several feet high on each side. On the brick pillar to the right in large black letters with white background are the words "West Gate". "Show Identification". "Dim Lights". "Traffic Regulations Strictly Enforced". On the left pillar is the same type of lettering reading "West Gate". Thirty-four feet to the east of this entrance, within the fort and in the center of the road, is a gate house for the sentries, who are required to stop and inspect all parties entering the fort. On the top of the gate house there is a sign reading "Fort Story Transportation Corps". Just to the front of the gate house and facing west is a reinforced concrete abutment 3 inches thick and 3 feet high painted with black and yellow stripes. In the center of the abutment is a "Stop" sign painted with luminous paint which reflects automobile lights. The road on each side of the

abutment is 19 feet 7 inches wide. This afforded defendant full opportunity to have missed striking the abutment by making a slight turn to the north or south.

Defendant's car came to rest immediately after the accident at a 45 degree angle 2 or 3 feet from the base of the abutment. There were no skid marks and it seems that the brakes were not applied. It was a total wreck. The windshield was thrown 35 feet from the car and the hub cap 19 feet, indicating that the car was traveling at a high rate of speed at a point where all travelers were directed to stop.

Defendant claims that due to head injuries sustained in the accident he did not remember many of the incidents that occurred just prior to the impact. His memory of incidents favorable to him seems to have been better than his memory of other matters not so favorable. He said he was somewhat blinded by the bright lights of a car which he thought came from a side road ahead of him, but which was evidently on Route 60 and made the turn at the intersection with Route 305. He also said the operator did not dim his lights "until he was almost meeting us." This testimony, if true, is no defense for the failure of defendant to see and heed the blinker light overhead at the intersection and the "Stop" and other signs indicating the entrance to the fort, all of which were east of the point where he met the westbound car. While the evidence is that the five electric lights, one on each side of the brick pillars, the red light on the abutment, and one on each side of the gateway, were off on this particular night, the other signs mentioned were plainly visible and within the range of the lights of an automobile traveling east.

There is no substantial contradiction of the evidence, which tends to show that the defendant drove his car at an excessive rate of speed for more than a mile down Route 60 in utter disregard of the numerous stop signs, speed signs, warning and caution signs and straight into the fort, striking an abutment, which could easily have been avoided even at the speed he was traveling if he had been keeping a reasonable lookout.

Our conclusion is that the testimony is sufficient to justify the jury in finding defendant guilty of gross negligence.

Defendant's second contention is that the trial court erred in refusing to hold that plaintiff's decedent was guilty of contributory negligence as a matter of law.

This contention is based not upon the evidence introduced, but upon the failure of plaintiff to introduce evidence tending to prove

that decedent objected to or protested because of the action of defendant in driving at an excessive speed, past the maximum speed, warning and stop signs without heeding them. The burden was on defendant to prove contributory negligence, not upon the plaintiff to disprove it. The duty was upon the defendant, not the plaintiff, to exercise due care and caution in the operation of the automobile. There is not a scintilla of evidence tending to prove that the decedent said or did anything from the time he left the cafe, where defendant inquired as to the way to Virginia Beach, until the accident. He may or may not have been keeping a lookout and may or may not have seen the signs. It cannot be inferred from mere silence that decedent was aware of and failed to caution defendant about the manner in which he was operating his automobile. We find no evidence tending to prove plaintiff's decedent was guilty of contributory negligence.

■ Defendant's third contention is that the court committed reversible error in permitting him to be cross-examined about a written statement made soon after the accident and some time prior to the trial.

Defendant was not present at the trial, but his deposition was taken in Lincoln, Nebraska, on the 21st day of February, 1955, at which time and place both plaintiff and defendant were represented by local attorneys employed for that purpose. During the taking of the deposition defendant was cross-examined about a written statement signed by him soon after the accident. No objection was raised to the cross-examination or to the filing of the statement as a part of the deposition. After the deposition was filed in the clerk's office of the Law and Chancery Court of the City of Norfolk the case was continued on motion of defendant and set for trial on May 18, 1955. On this date, when the case was called for trial, and just before the jury was sworn, defendant for the first time objected to the introduction of the deposition on the ground that plaintiff had cross-examined defendant on the written statement contrary to the provisions of Code Sec. 8-293. If objection had been made at the time of the taking of the deposition or soon after it was filed in the clerk's office, plaintiff would have had an opportunity to retake the deposition and eliminate any reference to objectionable matter.

The only difference in the facts in this case and the facts in *Lawson v. S. W. Voluntary Ass'n*, 168 Va. 294, 191 S. E. 648, is that the motion to suppress the deposition in the latter case was made after the jury was sworn, and here immediately before the jury was sworn.

If the trial court in either case had sustained the objection it would have disrupted the docket and caused unreasonable delay and inconvenience to all parties concerned. In this case defendant would have gained nothing except a delay and additional expense, because it appears from his deposition that on March 2, 1954, he had been tried by a General Court Martial at the Naval Operating Base in Norfolk on the charge of negligent homicide of decedent. In the course of the present trial he testified in his own behalf and was cross-examined at length on his testimony given in the court martial proceedings. This is a proper subject for cross-examination and no valid exception could have been taken thereto. There is no substantial difference between the *ex parte* statements in the written affidavit signed by him and his testimony in the court martial proceedings. The motion to suppress the deposition came too late.

■ Defendant further contends that the court erred in granting Instructions P-3 and P-5 for plaintiff, and amending Instruction D-1 offered by him. Instruction P-3 is as follows:

"The Court instructs the jury that as a matter of law the defendant, Ketchmark, *failed to observe* the caution signs and blinker light and failed to drive his car within the speed limit. If you believe that such conduct was grossly negligent, then you must find your verdict in favor of the plaintiff, if such gross negligence was the cause of Rau's death."

The objections made to the instruction in the lower court were that it singles out and calls the attention of the jury to specific items and "impinges on the right of the jury to consider those matters for themselves. . . ." and ignores the defense of contributory negligence.

The objection urged in this court is that the instruction told the jury as a matter of law "that defendant did not see the caution signs and blinker light and failed to drive at a lawful speed." Whether the word "observe" as used in the instruction be taken to mean "to see", as defendant contends in this court, or "to heed", as he contended in the lower court, is immaterial. The substance of defendant's own testimony, which is not contradicted, is that he did not see, or did not recall seeing, the signs enumerated and drove by them and the blinker light at an excessive rate of speed. If he did not see them he violated his duty to keep a proper lookout. If he saw them he failed to "observe" or "to heed" what he saw. In either event, the objection is not well taken.

Defendant's other objection to Instruction P-3 is the same that he

makes to P-5, namely, that both are finding instructions and both ignore his defense of contributory negligence.

The court did by Instruction D-1 submit the issue of decedent's contributory negligence to the jury, but, as heretofore stated, there is no evidence in the record tending to establish such negligence and the submission of this issue to the jury was more favorable to defendant than the evidence justified.

Defendant objected to the court's amendment of Instruction D-1 by deleting the last sentence in italics. As offered it was as follows:

"The Court instructs the jury that in this case the deceased was a mere guest in the automobile, and it is the duty of the jury to find for the defendant, unless they believe from a preponderance of the evidence that the accident was caused by gross negligence of the defendant, Donald J. Ketchmark.

"And the Court instructs the jury that gross negligence is that degree of negligence which shows an utter disregard of prudence amounting to a complete neglect of the safety of another. *It is such heedless and reckless disregard of the rights of another as should shock fair-minded men.*"

It is difficult for a court to convey the exact meaning of "gross negligence" to a jury. In discussing the meaning of the phrase the courts frequently use language which is not appropriate in an instruction. The language of the first part of the instruction was first used in this court in *Wright* v. *Osborne*, 175 Va. 442, 445, 9 S. E. 2d 452. The definition there stated was cited with approval in numerous other cases, among them *Newell* v. *Riggins*, 197 Va. 490, 90 S. E. 2d 150.

The language of the deleted part of the instruction was first used by this court in *Carroll* v. *Miller*, 175 Va. 388, 399, 9 S. E. 2d 322, where this is said: "Indeed it is difficult to define gross negligence within the purview of the rule under discussion. Putting one's self in the place of the parties, to be gross it should shock fair-minded men." The instruction as offered contained two statements of this court, each made in different cases, where the court was endeavoring to make a short, practical definition of "gross negligence". They are repetitions of the same principle expressed differently. A refusal to give both is not reversible error. For other definitions of gross negligence see 18 Words and Phrases, p. 720; 13 M. J. Sec. 5, p. 511.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*