## Staunton

HOMER NEAL WRIGHT v. FRED B. TATE, JR., ADMINISTRATOR, ETC.

September 8, 1967.

Record No. 6459.

Present, All the Justices.

*Stuart B. Campbell, Jr.* (*Campbell & Campbell,* on brief), for plaintiff in error.

*James L. Warren; Aubrey R. Bowles, Jr.* (*Bowles and Boyd,* on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Leslie Robinson Wright, a guest passenger in an automobile operated by Homer Neal Wright, defendant, was fatally injured when the vehicle ran off Route 606 in Bland county and struck a tree. Fred B. Tate, Jr., Administrator of the estate of Leslie Robinson Wright, plaintiff, brought an action against defendant to recover damages for the wrongful death of his decedent.

In his motion for judgment plaintiff alleged, *inter alia,* that defendant was intoxicated at the time of the accident and drove his vehicle "in a grossly negligent manner". Defendant, in his answer denied the allegations and interposed the defenses of contributory negligence and assumption of risk. After overruling defendant's mo-

tions to strike plaintiff's evidence made at the conclusion of the plaintiff's evidence and again at the close of all the evidence, the case was submitted to a jury, who returned a verdict for plaintiff in the sum of $20,000. The trial court overruled defendant's motion to set aside the verdict and entered judgment thereon. Defendant is here upon a writ of error awarded to that judgment.

In his assignments of error defendant claims that the court erred (1) in overruling his motion to strike plaintiff's evidence; (2) in granting certain instructions; (3) in amending certain instructions, and (4) in refusing to set aside the verdict.

On the afternoon of July 18, 1964, Leslie Robinson Wright, plaintiff's decedent, and five of his friends, namely: Latha Spangler, Jimmy Spangler, Kermit Gussler, Gary Carroll and Homer Neal Wright, the defendant, met at Blankenship's store at Hollybrook in Bland county. Shortly thereafter it was decided that they would drive to a restaurant on Cloyd's mountain, a distance of about 20 miles, and purchase some beer. The group got into defendant's automobile and he proceeded to drive them to the restaurant.

The evidence clearly established that defendant was under the influence of intoxicants at the time the group left Hollybrook. Defendant testified: "Evidently I was drunk or had been drinking." According to Kermit Gussler, who had not consumed any alcoholic beverages, it was obvious that defendant had been drinking and he "was what you might say high." At times defendant operated the car at an excessive speed and "about everybody said something" to him about the manner in which he was driving. Gary Carroll described defendant's driving as "reckless" because he was "[t]aking the inside on turns; taking unnecessary chances." Both Gussler and Carroll stated that they were "scared".

Upon arrival at the restaurant on Cloyd's mountain, two cartons of beer were purchased. While the car was stopped there, Gussler asked permission to drive on the return trip because of defendant's condition and the reckless manner in which he had operated the vehicle. His request was refused and he then made an unsuccessful attempt to have the group "hitchhike" with him rather than ride in the automobile. Plaintiff's decedent, Leslie Wright, told Gussler that he thought he (Gussler) "ought to drive back." However, the group left the mountain in the car and proceeded back toward Hollybrook. Defendant continued to drive in a reckless manner.

On the way some of the beer was opened and it was found to be

frozen and undrinkable. Defendant then "asked the boys for a drink of liquor and they said they didn't have any, and he [defendant] said, 'Give me a drink or I'll kill you.' And the boys said, 'Well I'll give you a drink if you'll slow down some.' And they handed it up to him." Defendant drank some of the whiskey.

The group stopped at the home of Latha Spangler, about three miles from Hollybrook, "to put some water in the car because it was hot." There, Gussler again asked the occupants to "hitchhike" back home but none agreed.

After leaving the Spangler home, defendant continued to drive in a reckless manner. Gussler said that just before the accident defendant was driving "a little better than 60" on an uphill grade of the road which was "crooked". "He passed a truck on a turn, a blind turn. He didn't drive too fast, but he got off the road then, and just before he wrecked he speeded up some and was over on the wrong side of the road and just about hit a mail box. I remember that because some of the boys was laughing about having to buy a new mail box. And then I was kind of laying down on the back seat and the next thing I knew we hit the tree."

Trooper W. R. Fisher was notified of the accident at approximately 8:40 p.m. and proceeded to the scene. He described the road there as being about 18 feet wide and having a series of "S" curves. His investigation disclosed that defendant's vehicle traveled 262 feet along the ditch and bank before it struck the tree.

Leslie Wright, plaintiff's decedent, and one of the Spangler boys died as a result of the accident. The other occupants of the car received severe injuries.

Plaintiff's decedent, who was 22 years old at the time of his death, was single, resided with and supported his parents. His sister, Vieda Wright, testified that plaintiff's decedent dropped out of school about the fifth or sixth grade and worked as a farm laborer; that he could "read and write to an extent, and some things he could learn"; that he "never could learn like other children" and was called "Dummy"; that he was able to do the chores that are normally required on a farm, and that he lacked initiative.

Fred B. Tate, Jr., Leslie Wright's brother-in-law, testified: "He [Leslie Wright] was strong and he could do anything like manual labor that you'd want him to. * * * He couldn't operate a piece of machinery because he just didn't have the knowledge to get out of the way, and picking up corn and running it through a harvester,

which is dangerous, we wouldn't let him do that. You have to watch him real close, and the first time he tried to do that I saw that he couldn't do that. We put him to cutting corn and leveling off the silo or something like that * * *. He was capable of doing that as good as anybody could."

At the time of his death, Leslie Wright was employed as a general farm worker by Rex Morehead. Morehead stated that Leslie Wright could not be trusted "very far on his own"; that "[h]e wasn't capable of thinking for himself, or he would complete some small job, and he just couldn't go on to anything else. He would be digging post-holes on a few occasions, and if you weren't there to tell him to go to the next post hole he would just keep digging. He couldn't understand where to quit."

James Gordon Gussler, Kermit Gussler's uncle, who was engaged in the sawmill and mining business, formerly had employed Leslie Wright's father. He had occasion several years before the accident to observe plaintiff's decedent when he worked with his father "in getting out the mining timbers". James Gussler said that Leslie Wright was not "mentally capable. You'd tell him to do something and then he would be off on something else, and you couldn't have him around machinery."

Kermit Gussler and Gary Carroll, close friends of plaintiff's decedent, also testified as to his capabilities. Kermit Gussler said that he saw Leslie Wright daily; that he had on occasions worked with him; that he "wasn't what you'd call too bright, but everybody liked him and he worked good and everything", and that he "was just not too smart and he couldn't learn anything." Carroll stated that Leslie Wright did not have the mind of an ordinary person his age, and that he did not know whether plaintiff's decedent could appreciate danger.

As has been stated, defendant moved to strike plaintiff's evidence and enter summary judgment for him on the grounds that the evidence showed, as a matter of law, that plaintiff's decedent was guilty of contributory negligence and that he also assumed the risk, which in either event barred a recovery. Defendant, in arguing the motion, contended that plaintiff's decedent was charged with the same degree of care for his own safety as an ordinary prudent person. In overruling the motion, the trial court observed that plaintiff "has sought to show that the decedent Wright was of low mentality and not able to recognize danger as it existed, which I think poses a jury question * * *."

In adhering to this ruling, the court gave instructions so as to allow the jury to find for the plaintiff, notwithstanding his decedent's contributory negligence or assumption of risk, if the decedent "lacked the mental capacity and alertness of mind to recognize danger or peril and to appraise the manner in which Homer Neal Wright was operating said automobile."

In Restatement, (Second), Torts, (1965) § 464, p. 507, the standard of conduct relating to contributory negligence is defined thus: "Unless the actor is a child or an insane person, the standard of conduct to which he must conform for his own protection is that of a reasonable man under like circumstances." Under Comment g. of § 464, p. 509, it is stated: "Mental deficiency which falls short of insanity, however, does not excuse conduct which is otherwise contributory negligence."

Under these principles, which we adopt, an adult who is of low mentality but not insane is held to the same standard of care as a person of greater intellect. If the rule were otherwise, there would be a different standard for each level of intelligence resulting in confusion and uncertainty in the law.

Here, the evidence shows that plaintiff's decedent was a person of low mentality who was capable of performing only the simplest of tasks, could not be trusted around machinery because "he might get hurt", and lacked initiative. There was no showing that he was insane or that a guardian had ever been appointed to care for either his person or property. There was no medical testimony with regard to his mental status. Moreover, plaintiff's decedent was regularly employed as a farm worker and supported the family. His sister testified that he could "read and write to an extent, and some things he could learn." He was able to cash his pay checks and to purchase provisions for the family. According to his brother-in-law, "[h]e was strong and * * * proud to work." Since insanity was not shown, plaintiff's decedent was bound by the standard of conduct "of a reasonable man under like circumstances."

"* * * We have several times said that a guest may be guilty of contributory negligence if he knows or reasonably should know that his driver had been drinking intoxicating liquor to an extent likely to affect the manner of his driving and voluntarily continues as a passenger after a reasonable opportunity to leave the automobile. *Seaboard Air Line Ry. Co.* v. *Terrell*, 149 Va. 344, 354, 355, 141 S.E. 231; *Yorke* v. *Maynard*, 173 Va. 183, 188, 3 S.E. 2d 366, 369;

*Bates, Adm'x* v. *Thompson,* 200 Va. 501, 506, 106 S.E. 2d 728, 732.

"However, in *Yorke* v. *Maynard, supra,* we pointed out that the fact that the host had been drinking and the guest had knowledge of this fact is not sufficient to establish contributory negligence as a matter of law. 173 Va. at 188, 3 S.E. 2d at 368. See also *Yorke* v. *Cottle,* 173 Va. 372, 4 S.E. 2d 372. The evidence must go beyond this and show that because of his drinking the driver's ability to drive was impaired, that the guest knew, or in the exercise of ordinary care should have known, this and yet entered or continued to ride in the car. Whether the guest knew or should have known that the intoxicated condition of the driver impaired his ability to drive is ordinarily a question for the jury. 8 Am. Jur. 2d, Automobiles, etc., §§ 537, 538, pp. 94-96." *Meade, Adm'r* v. *Meade, Adm'r,* 206 Va. 823, 827, 147 S.E. 2d 171, 174.

Here, there was no conflict in the evidence as to whether defendant was in an intoxicated condition from the time the group left Blankenship's store at Hollybrook until the time of the mishap. All of the evidence showed that defendant was in such a condition. Under the circumstances that existed, a reasonable man should have known, as a matter of law, that the intoxicated condition of defendant impaired his ability to drive. Thus, there was no jury question on this point.

Plaintiff's decedent voluntarily entered the car at Hollybrook which was driven by defendant at high speeds and in a very reckless manner. When the group reached the restaurant on Cloyd's mountain and stopped for beer, Kermit Gussler requested that he be permitted to drive back to Hollybrook, but his request was denied. He then asked the occupants to "hitchhike" back to Hollybrook with him. No one accepted his invitation and they started on the return trip, with defendant driving the vehicle. But before they left the mountain, plaintiff's decedent told Kermit Gussler that he should drive the car. This fact is uncontradicted. Hence, plaintiff's decedent recognized his safety was in jeopardy with defendant driving.

On the return trip defendant continued to drive the car in a reckless manner. When they stopped at Latha Spangler's home to put water in the radiator, plaintiff's decedent had another opportunity to alight from the automobile and avoid exposure to further recklessness of the driver. There, Kermit Gussler renewed his invitation to "hitchhike", but plaintiff's decedent elected to continue on the ride. After further reckless driving by defendant, the fatal crash occurred.

We hold that plaintiff's decedent was, as a matter of law, contribu-

torily negligent. He entered defendant's car when he knew or in the exercise of ordinary care should have known that defendant's driving ability was impaired. Further, upon witnessing defendant's careless operation of the vehicle, he continued to ride after having had a reasonable opportunity to alight from the car. Thus, the trial court erred in overruling defendant's motion to strike plaintiff's evidence.

In view of this conclusion, it becomes unnecessary to discuss other errors assigned.

Accordingly, the verdict of the jury is set aside; the judgment appealed from is reversed; and final judgment is entered here for defendant.

*Reversed and final judgment.*